## UNITED STATES v. HAINER. *
### No. 6819.

Circuit Court of Appeals, Ninth Circuit.

Nov. 7, 1932.

George Neuner, U. S. Atty., and Livy Stipp, Asst. U. S. Atty., both of Portland, Or.

Allan A. Bynon, of Portland, Or., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and NETERER, District Judge.

WILBUR, Circuit Judge.

The government appeals from a judgment upon a war risk insurance policy based upon the alleged permanent and total disability of the plaintiff occurring on or before, and continuing after, July 31, 1919. The error assigned is the refusal of the trial court to direct a verdict in favor of the government.

There was substantial evidence that at the time of the trial, and as early as Octo-
*Rehearing denied January 9, 1933.

ber 7, 1930, the plaintiff was suffering from severe bronchial asthma associated with tremendous difficulty in breathing, particularly on the slightest exercise. Dr. Staub testified, "He couldn't have any more severe bronchitis and asthma than he has and be able to walk about"; that walking thirty-five to forty feet from his reception room to the examining room "put his heart to pounding and shortness of breath." The contention of the appellant is that there is no substantial evidence that this condition began before the policy lapsed on July 31, 1919. The expert witnesses who testified for the plaintiff stated that his condition was a progressive one. Dr. Rush, who examined the plaintiff in 1930 and testified on his behalf, stated, "The condition I found him in last week is a progressive condition. I do not know when it reached the degree that I found him in last week." Dr. Staub, who first saw the plaintiff October 7, 1930, seven days before the trial, testified that the condition in which he now finds the plaintiff "was probably a progressive condition at some stage and then became constant." Dr. Moran, testifying for the plaintiff, said, "The condition I now find him in is the result of a progressive condition." Plaintiff's experts, in answer to hypothetical questions, attributed his asthma and bronchitis to service conditions and to pneumonia, colds, and gassing suffered by the plaintiff while overseas. Dr. John F. Steel, who had specialized in diseases of the heart and lungs, testified for the appellant, in part, as follows:

"I examined Orren Hainer on March 19, 1923, and reached the diagnosis, as the result of the examination, of chronic bronchitis, moderate degree, and no cardiac pathology. From the examination I found no organic disease of the heart, nor did I find any functional disease of the heart. The patient should be able to work continuously so far as his heart is concerned.

"The only condition I found was bronchitis, chronic, moderate. By that I mean the bronchitis was not severe.

"In my findings I also said there seemed to be a tendency of bronchial asthma, but not sufficient signs present for diagnosis of asthma. I would find these same signs present in a case of bronchitis.

"He was not, in my opinion, suffering from any impairment, at the time of the examination, which rendered it impossible for him to follow continuously any substantially gainful occupation.

"In giving me his history at the time of

the examination, the patient stated that he had been a donkey engineer since discharge, and had been at that most of the time since discharge."

The plaintiff's work record shows that he was actually working at a substantially gainful occupation most of the time immediately after his discharge. Plaintiff testified that he worked for the Aberdeen water department after his. discharge from the Army, and the records of the water department show the dates as follows:

"The time he worked and the amounts received are:

"First half of August—8 days, $5.75 a day.

"The records do not show the exact date he began work.

"Second half of August—12 days, 5 hours.

"First half of September—9 days, 1 hour.

"He received $5.75 a day. When he worked overtime he received in proportion to that amount.

"Last half of September—13 days; same amount.

"First half of October—15 days, 3½ hours.

"Last half of October—11 days, 4 hours.

"First half of November—10 days.

"Pay raised to $6 a day.

"Last half of November—10 days; same wages.

"First half of December—12 days, 7 hours.

"Last half of December—3 days, 4 hours.

"First half of January—13 days, 5 hours.

"Last half of January—10 days, 5 hours.

"First half of February—3 days, 4 hours."

The plaintiff testified as to this work as follows:

"I went to work on a truck. A short time after, I was put to work inspecting hydrants; worked on hydrants, little odd jobs, pretty near all the rest of my time there. I got along with that work none too good. Several times I was off, two or three times, from my cough. That was in the winter of 1919 and the first of the year 1920. I can't give the date when I started to work there nor the date when I quit. I know it was the first of the month—ninth or tenth—in August, and I worked—I think it was March I left there, 1920. I worked the fall and winter to March, 1920.

"I continued to sneeze and cough and laid off on that account several times. Mr. Boyd told me I was laying off too often and he would have to let me go. The discharge came at the end of a period of laying off. I had been off sick and reported for work. He told me not to come back."

Plaintiff next worked for the Lincoln Creek Lumber Company at Centralia from the middle of April, 1920, to the middle of June, 1920, and later for a month and a half. In November, December, 1920, and January, 1921, he worked for the Chehalis Mill Company at Chehalis, Wash., as follows:

| | |
|---|---:|
| Nov. 1920, 5½ days locomotive engineer at $6.00 per day | $ 33.00 |
| 4½ days donkey engineer at $8.00 per day | 36.00 |
| Dec., 31⅜ days, locomotive engineer at $6.00 per day | 188.50 |
| Jan. 1921, 24 days 5½ hours, locomotive engineer at $6.00 per day | 148.12 |
| Total | $405.62 |

The honorable discharge of plaintiff from the Army recited that "Physical Condition when discharged, Good," but the plaintiff apparently did not answer the question therein asked as to his condition of health. The plaintiff emphasizes certain portions of his testimony as supporting his claim that there was substantial evidence that his total disability has existed from the time of his discharge. After stating that he worked for H. H. Morton in March, 1924, to April 15, he said, "I didn't get along very good. I have not been free from this trouble since service." Again in testifying as to his work after November 5, 1929, picking hops and beans:

"I couldn't stand the dust. They would drag a boat between the rows and that would raise the dust. Particles of dust simply chokes me up, I can't breathe at all. I am troubled with that condition all the time. I never have any relief from it. When I do manual labor I have a feeling like going down; I can't get my breath.

"Q. Have you been in that condition since you were discharged from the Army? A. Yes, sir."

C. G. Olmstead testified that he saw the plaintiff shortly after his discharge; that he was coughing all the time and complained of his chest hurting all the time; that they lived together on and off for a year; that the witness "didn't get any sleep nights because he kept coughing all night long. Kept me awake." A. G. Olmstead, a brother of the last witness, testified as follows: "I saw him

a couple of months after his return from service. His condition wasn't very good. He was wheezing and coughing and gasping for breath. I asked him what was the matter. He told me a cold and one thing and another. His lungs was all affected; he couldn't hardly breathe."

There is no substantial evidence to submit to a jury upon the question of the total disability of the plaintiff before July 31, 1919, in view of his work record. He may have worked under difficulties, but there is no sufficient showing that he was unable to do what he did do. The evidence, without substantial conflict, shows that his condition was progressive, and that he did not become totally and permanently disabled until long after his war risk insurance policy had expired.

Judgment reversed.